Breitel, J. (dissenting).
On his appeal defendant Yukl raises the only issue available to him in this court, the powers of review of wMch are limited, namely, whether the evidentiary record allows that his confessions of murder and sodomy were made either before his interrogation had become custodial, or were thereafter voluntarily made under the rules mandated in. Miranda v. Arizona (384 U. S. 436). It is undisputed and indisputable that Yukl, through his wife, called the police, voluntarily spoke with them at his home, and went willingly to the police station. By the time of the confessions he was being and had been questioned incommunicado for hours, separated from his wife, who had accompanied him to the police station. He was shoeless, without trousers or undershorts, before he was given the mandated warnings. If what preceded immediately and what followed the giving of the warnings can be found to be a voluntary waiver of constitutional rights and a voluntary submission to police interrogation, legal analysis becomes divorced from reality and the credible events.
Yukl, about 31 years old at the time of the arrest, was a musician who had graduated from high school and had been in the Navy. For about 9 or 10 months, he had been a nonuniformed “ auxiliary policeman.”
The facts, as found by the hearing court or otherwise undisputed, are, in substance, that the police arrived at Yukl’s apartment about 10:00 p.m. on the evening of October 24, 1966, in response to a telephone call made by Yukl’s wife, Enken. The police spoke to Yukl and Ms wife, first in the vacant second-floor apartment where the body of the victim was found, and *593 later in the Yukls ’ third-floor apartment, initially together and then separately. Yukl and his wife were brought to the station house at approximately 1:30 a.m., October 25. Interrogation of Yukl at the station house began between 2:30 and 3:00 a.m. At about 3:00 a.m. Yukl was asked to remove his shoes because the police wanted to examine what appeared to be bloodstains. The interrogation continued, the hearing court found, and YuH maintained his story that he had discovered the body of Susan Reynolds, his music student, upon returning to the apartment building after walking his dog. During this period Yukl asked to see his wife. At about 6:45 a.m. one detective noticed a white spot on Yukl’s trousers and asked Yukl to remove them for closer examination. Brown stains were noticed on Yukl’s jockey shorts, and again, upon request, these were surrendered to the detective. These were examined and Yukl was asked how fecal stains appeared to be on his genitalia. The hearing court made no finding as to how or whether this question was answered.
The warnings required by the Miranda case (supra) were then given, and Yukl signed a written waiver of his rights. Samples of pubic hair were then taken, first without Yukl’s permission, and later with his consent. Yukl was given back his trousers and after about an hour of additional questioning, he stated that he had discovered the victim’s dead body and committed an act of sodomy upon it. After this confession at approximately 8:00 a.m., Yukl was given a 45-minute coffee break. Questioning resumed, and at approximately 10:00 a.m., Yukl admitted that he had strangled Susan Reynolds. A full, stenographically recorded statement was taken by an assistant district attorney after 12:00 noon, following a repetition of the Miranda warnings.
The hearing court found that Yukl was not in custody until the discovery of the stain on his trousers, and that the Miranda warnings were timely and properly given. Inasmuch as the first statements were found to be voluntarily given after proper Miranda warnings, the court found no involuntariness as to the second confession, given after repetition of the Miranda warnings.
The fact that Yukl had asked for his wife during the night, and the fact that he was given nothing to eat until 8:00 a.m., *594 were considered factors to be weighed on the issue of voluntariness, which was resolved in favor of the People.
Yukl and his wife testified to versions of the facts surrounding the confessions different from the police. They claimed that Yukl had been intensively questioned in his apartment and was told to accompany the police to the station house. There he was questioned in relays for about an hour, told to surrender his shoes, and denied permission to go home or see his wife. After further intensive interrogation he was ordered to drop his trousers and his jockey shorts, and upon his demurrer and request for the presence of a physician, was threatened with detention until he complied. He claims that he was not informed of his constitutional rights until after he had signed a statement admitting the murder.
The police officers testified that the questioning had been low-keyed, that Yukl had voluntarily accompanied them to the police station, had voluntarily surrendered his shoes, and had voluntarily removed both his trousers and his jockey shorts. They did, however, disagree as to whether Yukl had first been requested to remove his clothing, or had spontaneously removed them when the police indicated a desire to examine them; whether his jockey shorts as well as his trousers were already removed at the time the Miranda warnings were given; and at what time Yukl was eventually permitted to see his wife.
It may be argued, and it is difficult to reject the argument, that the police version of the interrogation was so unreliable as not to be credited even to the limited extent found by the hearing court. But even upon acceptance of the facts as found, under the rule of People v. Leonti (18 N Y 2d 384, 389-390), a reversal .is required.
Thus, the evidentiary facts, even on the police version to the extent credited by the hearing court, establish that Yukl was a suspect in custody long before the Miranda warnings were given at 6:45 a.m. If Yukl was not a suspect or in custody when he was invited down to the station house at 1:30 a.m., or when questioning began between 2:30 a.m. and 3:00 a.m., it is apparent that the police suspected greater involvement and manifested custodial control of Yukl when they requested that he remove his shoes for examination at about 3:00 a.m. Certainly, the removal of the shoes, apparently never returned, effectively *595 curtailed his freedom of movement long before he was formally, that is, explicitly, declared to be in custody. It is unlikely to the point of incredibility that Yukl would have been subjected to three and a half hours of continuous interrogation if the police officers believed only that he had merely discovered the body. Nor could Yukl fail, by that time, to realize that he was no longer a witness but a suspect in custody.
That Yukl was in custody is established by more than this circumstantial evidence. The hearing court found that Yukl “ probably did ask for his wife during the night ”, a clear reference to the period preceding the discovery of the stains on his trousers at 6:45 a.m. (The People, while arguing that this is not a “specific finding ”, concede that the court’s reference places the time of the requests prior to the discovery of the trouser stain.) The hearing court erred when it denominated this a mere ‘ ‘ factor which would go to the weight to be accorded to the claim of involuntariness ”, for Yukl’s requests to see his wife, presumably coupled with police refusals, establish that Yukl was questioned, in custody, before the Miranda warnings were given.
Miranda warnings, even if given before a suspect in custody makes any damaging admission, may nevertheless be given under circumstances which nullify their effectiveness. Thus, in Miranda v. Arizona (Westover v. United States) (384 U. S. 436, 494-497, supra) it was held that warnings alone would be insufficent to protect the privilege. against self incrimination when they followed upon prior lengthy custodial interrogation without warnings, in the same coercive surroundings. (It should be noted that Westover had not been given full Miranda warnings, particularly that concerning the provision of free counsel to the indigent. The court’s result, however, rested on the delay in the giving of the warnings.)
In the instant case, the questioning was continuous from 2:30 or 3:00 a.m., and unlike the Westover case, involved questioning by the same police authorities, as to the same crime. Moreover, the warnings were given, and the waiver signed, as Yukl, at police request, sat without shoes, trousers or jockey shorts, a circumstance that necessarily nullified, even if without design on the part of the police, the possible effectiveness of any recitation of Yukl’s civil rights. Indeed, the situation as described, *596 and even if fully credited, is a burlesque of advice concerning the constitutional privileges. It hardly suggests an appropriate context for a “ voluntary, knowing and intelligent waiver ” of defendant’s privilege against self incrimination or the right to counsel.
The warnings were given, moreover, after Yukl had “ voluntarily ” surrendered his shoes, and had by disrobing revealed the fecal stains on his undershorts and genitalia. Thus the warnings were given only immediately after Yukl had revealed highly incriminating, if not utterly damning, evidence. Although custodial interrogation preceded the Miranda warning, Yukl was not formally, that is, explicitly, placed under arrest during the pre-warning period. Of course, had Yukl been formally arrested, or if there was probable cause to permit a search immediately in advance of arrest, a search of his person could have been made, but then further interrogation without the constitutional warnings would have been inhibited. But there is no contention that Yukl was under arrest at this stage, because if he were it would be an indirect concession that the Miranda warnings came too late. Hence, the search of his person before arrest producing the evidence which resulted in Yukl’s first admission was valid only if conducted pursuant to a valid waiver (People v. Paulin, 25 N Y 2d 445; People v. O’Neill, 11 N Y 2d 148, 153; People v. Loria, 10 N Y 2d 368, 373). An intelligent and voluntary waiver of known rights may not be inferred or found merely because Yukl complied with a request to remove his clothes, under circumstances of prolonged intensive incommunicado interrogation at a station house.
Once again, it must be. emphasized that Yukl had been questioned in the station house for some three and a half hours by several detectives, and had been denied an opportunity to speak with his wife.
Under such circumstances, although otherwise warnings of rights might not be necessary, it was necessary to make sure that Yukl was not surrendering his clothes under compulsion. The bare verbalization of a police request, under the circumstances, was indistinguishable from an explicit command. (See, generally, Ann. Search-Consent While in Custody, 9 ALR 3d 858.)
*597 Thus, as a result of the improperly obtained physical evidence just prior to the Mircmda warnings, in addition to all that had occurred before, Yukl’s ability to resist ensuing questioning was so seriously impaired as to render the warnings nugatory.
These defects were not cured by the later Miranda warnings preceding the stenographically recorded confession taken the next day, more than eight hours since the start of his incommunicado interrogation at the police station.
No finding was made as to precisely how long the interrogation continued after the ineffective first Miranda warning, or how long questioning was halted before the formal statement was taken by the assistant district attorney. The People’s witnesses testified to a hiatus of approximately two hours, from 10:30 or 11:00 a.m. to 12:40 p.m., while the Yukls testified that the break was considerably shorter and that Mrs. Yukl was separated from her husband after 5 or 10 minutes. It was only at the break that Yukl was first permitted to speak to his wife.
That break, although longer than the one in the Westover case, was nevertheless too short to insulate the later confession, given after proper Miranda warnings, from the improprieties that preceded it. Unlike the event in the West over case (supra), Yukl had already confessed prior to the interrogation by the assistant district attorney. The second statement was given in the same station house as the first. The warnings were given and the questions were asked in the presence of the same detectives to whom Yukl had given his first confession just a few hours before. The second confession, although preceded by a Miranda warning, followed at least eight hours of questioning throughout the preceding night and morning. Under such circumstances, Yukl’s confession was not preceded by warnings given under circumstances insuring protection of the privilege (cf. People v. Stephen J. B., 23 N Y 2d 611, 615-616). Instead, the second warning and confession, followed so closely upon the initial improper interrogation as to render the later statement inadmissible as well.
In the face of the circumstances described it is quite impossible to conclude on any rational or credible basis that constitutional standards have been satisfied. This conclusion is driven in all the harder once it is recognized that in dealing with a waiver *598 of constitutional rights a heavy burden rests on the prosecution. Thus in the Miranda case it was said: “ If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel ” (384 U. S., at p. 475, supra).
A man, shoeless and all but naked, separated from his wife who is elsewhere in the station house, alone, except for interrogating policemen, and after having been subjected to many hours of interrogation about a murder, is not free to move, is certainly in custody, and is not in a condition to make an intelligent, knowing, and voluntary waiver, even if the Miranda warnings are eventually given before admissions are made.
The warnings had not been given in time. YuH had been deprived of his shoes by “ consent ”, his trousers also by “ consent ”, and finally his undershorts also by “ consent ”, before the warnings. He had been questioned for hours before the warnings. Indeed, in the context of the events in this case when Yukl was taken to the station house it was obvious that the first act of this bizarre drama had been completed.
Indeed, on the matter of surrender of his clothing it would seem that in view of the coercive custodial environment in which he had been placed, there was no police right to take or receive his clothing unless incidental to a formal arrest. No exchange of formal words of courtesy can transform what occurred into a voluntary surrender of clothing. On these issues there is no credible evidence or acceptable interpretation sufficent to transform this police station scene into an illustration of consensual, voluntary compliance under constitutional standards.
The facts present, under the standards of any day, a grossly humiliating coercive degradation of a suspect human being in obtaining his confession to a particularly repulsive heinous murder. To put a gloss on the events, resting on verbalized voluntary relinquishments of clothing which reduced defendant to immobility and effective loss of will to make any intelligent or voluntary choice, is to stultify the police process, warnings mandated by the Supreme Court, and any judicial process that purports to accept sincerely such a burlesque distortion of an *599 otherwise simple relationship. It is stating what is unnecessary that however repulsive and serious the crime, however patently guilty the defendant, the police interrogation process in this case, however zealously motivated, did not yield, under current mandated standards, evidence admissible in a court of law.
Accordingly, I dissent and vote to reverse the judgment of conviction, to vacate the plea of guilty, and to remand the proceedings to the Supreme Court for such further action as may be appropriate.
Judges Scileppi, Bergan and Gibson concur with Judge Jasen; Judge Breitel dissents and votes to reverse in a separate opinion in which Chief Judge Fuld and Judge Burke concur.
Judgment affirmed.